JUDY DONOVAN, Indiv. and as Adm'r of the Estate of James E. Donovan, Deceased, Appellant, v. THE VILLAGE OF OHIO *et al.*, Appellees.

Third District   No. 3—08—0776

Opinion filed January 11, 2010.

Louis F. Pignatelli and Magen J. Mertes (argued), both of Pignatelli & Mertes, P.C., of Rock Falls, for appellant.

John P. Fleming and Shelley McCormick (argued), of Fleming & Umland, of Peoria, for appellee Village of Ohio.

Stephen H. DiNolfo (argued) and Ericka J. Thomas, both of Ottosen Britz Kelly Cooper & Gilbert, Ltd., of Naperville, for appellee Bureau County Enhanced 911.

PRESIDING JUSTICE HOLDRIDGE delivered the opinion of the court:

James E. Donovan died in a fire at Turner's Tap in Walnut, Illinois. Judy Donovan, his widow and the administrator of his estate, filed a lawsuit against four defendants: the County of Bureau (the County), the Village of Ohio (the Village), the Bureau County Emergency Board, a/k/a Bureau County Enhanced 911 (the Board), and Turner's Tap. Judy's complaint alleged, *inter alia*, an electronic equipment failure of the 911 emergency response system. Her claims against the County were dismissed, and she settled her claims against Turner's Tap. The Village and the Board then filed motions for summary judgment, which were granted. Judy appeals from the order granting those motions.

## BACKGROUND

On January 29, 2003, at around 8 p.m., a fire broke out at Turner's Tap. After attempts to extinguish the fire failed, several 911 telephone calls were made to request emergency assistance. Mr. Donovan, a patron at the tap, died in the fire due to asphyxia from smoke inhalation. The 911 system included a signal repeater (an electronic device that receives a radio signal on one frequency and retransmits it on another) atop the Village's water tower. Judy alleged that certain fire departments could not be paged by the 911 dispatcher because this repeater failed.

Doug Miller, coordinator for the Board, testified that when he first became the coordinator in 1998, there was no repeater system in Bureau County. In 1999, a repeater was installed in Providence (the highest spot in the county), and another was subsequently installed in Spring Valley to address signal strength issues in the lower southeast corner of the river valley. Based on a signal strength test commissioned by the County in approximately 2001, there was adequate signal coverage countywide. Nonetheless, due to reported problems with receiving 911 pages in LaMoille and Walnut, the Board decided to add a repeater in the Village of Ohio. The Village was chosen as the instal-

lation site because it was situated between LaMoille and Walnut, and a repeater located there could service both communities. The Board's system could only accommodate one more repeater without requiring an expensive upgrade to its main console.

In May of 2002, Miller sent a letter to Jim Lamkin, the Village's maintenance supervisor, requesting authorization to place a repeater and a universal power supply (UPS) at the water tower site. Miller also requested access to a single electrical outlet. According to the letter, the Board would "bear all costs of acquisition, installation, maintenance, and insurance" if the Village would provide the "space and electrical power to house and operate the repeater as a partner in public safety." The Village obliged, whereupon two installation options were considered. The first option was to install the repeater's antenna on the water tower while maintaining its base station and UPS in the Village's adjacent fire station. This arrangement would have required 125 feet of coaxial cable from the antenna to the base station, resulting in a significant loss of signal strength. The second option was to install the base station and UPS directly in the base of the tower, housed in a weatherproof cabinet to eliminate the effects of moisture. This arrangement would maximize the signal strength while eliminating the need to drill a hole in the tower wall and trench cable to the fire station.

Ultimately, the Board chose the second option. The repeater was supposed to occupy an electrical circuit with the tower light and no other equipment, thus reducing the chances of the circuit tripping and cutting off power to the repeater. If the repeater did lose power through the circuit, the battery-operated UPS would provide uninterrupted power for at least four hours. Miller testified that the Board chose the UPS for an additional layer of backup even though it was not required. A gas-powered generator backup would have provided run time proportionate to the size of its fuel tank. The Board never priced a generator or installed an alarm or monitoring system to alert the 911 dispatcher if the repeater became inoperable. The project had a budget of $10,000, and Miller ended up spending $5,608.75.

Ross Beedle, a radio communications technician and the owner of Gem Electronics, consulted with the Board on the project and performed the installation. In his deposition testimony, Beedle described generator backup as a "waste of money," stating, "as long as somebody don't kick the plug out of the floor or come unhook the antenna cable out of the back of the repeater, which could happen, it ought to work." He acknowledged that a repeater system could be hard wired to prevent unplugging, but he had never hard wired one before. He also acknowledged that electrical circuit problems could cut

off power to a repeater. When asked if he discussed with Doug Miller the importance of having the repeater on a separate electrical circuit, Beedle stated, "I'm sure I did not" because "I've never thought it was that important." His recommendation for power backup was the UPS.

The evidence shows that on January 29, 2003, the 911 dispatcher's page did not reach the Walnut fire department because the repeater atop the Village's water tower failed to transmit the page. A sump pump at the tower was plugged into the same electrical circuit as the repeater, and the pump tripped the circuit breaker after becoming frozen in ice. Although the UPS provided uninterrupted power, its battery became depleted before anyone discovered the problem. The 911 page occurred after the UPS went down.

Donald Prince, a member of the Board, testified that he subsequently met with Miller, Lamkin, and some electricians at the water tower to check for problems with the repeater unit. He observed that no power was going into the unit. At that time, according to Miller's deposition testimony, Lamkin advised that "within a day or two prior *** he had experienced that a circuit had *** popped for whatever reason, he reset it and everything from his observation seemed to be working fine." The men who visited the tower after the incident determined that the sump pump had tripped the circuit breaker and cut off power to the repeater. According to Prince, they were all surprised to learn that something else was on the same circuit as the repeater. Miller said the Village had advised him that the repeater was on an individual circuit.

Only two individuals at the Village had keys to the water tower, Mayor Charles Thomas and Jim Lamkin. Thomas testified that the electrical outlet in question was installed when the tower was constructed in 1988 because the Village planned to place Christmas lights atop the tower. Neither Thomas nor Lamkin had been involved in the construction or design of the tower and its accompanying systems. Moreover, at the time of the fire, no modifications or additions had been made to the tower. Thomas informed Doug Miller that the Village would allow installation of the repeater so long as the Board assumed total responsibility because the Village had just one employee. Lamkin did not make any decisions or offer any input regarding expectations or requirements for the repeater; he simply met with the Board to show them the water tower and assure that someone was present when individuals went inside the tower.

Thomas denied that the Village had prior knowledge of any failure or malfunction in the repeater. He also denied prior knowledge of any electrical problems with the circuit breaker that serviced the repeater. Lamkin offered similar testimony, specifically denying any knowledge

of the breaker tripping prior to January 29, 2003. As mayor of the Village, Thomas recalled only one incident involving circuit breakers: Immediately following construction of the water tower in 1988, a pickup truck heater was "plugged in" and blew a breaker. The Village offered evidence that neither Thomas nor Lamkin was aware, prior to January 29, 2003, that the sump pump utilized the same circuit as the repeater. Evidence was also offered that Lamkin believed there were no other electrical devices connected to the outlet box in the tower.

## DISCUSSION

Summary judgment is appropriate where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2—1005(c) (West 2006). "While summary judgment aids in the expeditious disposition of a lawsuit, it is a drastic means of disposing of litigation and thus should be allowed only when the right of the moving party is clear and free from doubt." *Ford v. Round Barn True Value, Inc.*, 377 Ill. App. 3d 1109, 1116 (2007). Summary judgment for the defendant is proper if the plaintiff fails to establish any element of the cause of action. *Williams v. Manchester*, 228 Ill. 2d 404 (2008). We review the trial court's ruling on a motion for summary judgment *de novo. Williams*, 228 Ill. 2d 404.

■ In the instant case, all parties agree that the Village and Board are statutorily immune from liability except for willful and wanton misconduct. This qualified immunity is codified in section 15.1 of the Emergency Telephone System Act (ETS Act), which reads:

"No public agency, public safety agency, emergency telephone system board, or unit of local government assuming the duties of an emergency telephone system board, nor any officer, agent or employee of any public agency, public safety agency, emergency telephone system board, or unit of local government assuming the duties of an emergency telephone system board, shall be liable for any civil damages as a result of any act or omission, except willful or wanton misconduct, in connection with developing, adopting, operating or implementing any plan or system required by this Act." 50 ILCS 750/15.1 (West 2006).

" 'Willful and wanton conduct' *** means a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1—210 (West 2006).

■ The question of immunity, however, is not relevant unless the defendant owes a duty to the plaintiff in the first place. As the Illinois

Supreme Court has explained: "The distinction between an immunity and a duty is crucial, because only if a duty is found is the issue of whether an immunity or defense is available to the governmental entity considered." *Zimmerman v. Village of Skokie*, 183 Ill. 2d 30, 46 (1998). In light of this authority, we conclude that summary judgment was proper because the Board and Village did not owe a duty to Mr. Donovan.

■ This conclusion stems from the public duty rule, "a long-standing precept which establishes that a governmental entity and its employees owe no duty of care to individual members of the general public to provide governmental services, such as police and fire protection." *Zimmerman*, 183 Ill. 2d at 32; *cf.* 745 ILCS 10/5—101 (West 2006) ("Neither a local public entity nor a public employee is liable for failure to establish a fire department or otherwise to provide fire protection, rescue or other emergency service"); 745 ILCS 10/2—201 (West 2006) ("Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused").

Judy alleges that the Board and Village failed to execute duties outlined in the ETS Act, such as:

> "(1) Planning a 9-1-1 system.
> (2) Coordinating and supervising the implementation, upgrading, or maintenance of the system, including the establishment of equipment specifications and coding systems." 50 ILCS 750/15.4(b)(1), (b)(2) (West 2006).

These are independent statutory duties that follow the decision to provide services. However, in light of the public duty rule, the mere existence of such duties does not answer the fundamental question at issue: to whom are the duties owed?

In *Sims-Hearn v. Office of the Medical Examiner*, 359 Ill. App. 3d 439 (2005), a dismissal of the plaintiff's complaint (alleging a botched autopsy) was affirmed despite her evidence of errors and omissions in the autopsy report. In *Ware v. City of Chicago*, 375 Ill. App. 3d 574 (2007), an order denying the defendant's motion to dismiss was reversed despite evidence presented by the plaintiff (who alleged willful and wanton conduct in the enforcement of a building code) that a porch collapsed causing multiple deaths. In neither of these cases did the court find that the defendant owed no duty whatsoever; rather, the court in each case found that any duty owed was owed to the public at large, not the individual plaintiff. See *Sims-Hearn*, 359 Ill. App. 3d at 445-46; *Ware*, 375 Ill. App. 3d at 581.

■ The same result is warranted here. Once a 911 system was provided, the ETS Act did establish duties applicable to the administration of the system (as Judy argues). However, those duties ran to the public at large, not to each citizen individually. The duty element of Judy's cause of action is thus missing.

Judy argues that this conclusion nullifies section 15.1 of the ETS Act (50 ILCS 750/15.1 (West 2006)) by eliminating all situations where a private citizen could sue for willful and wanton conduct. This argument does not persuade, however, because the public duty rule is not absolute. For instance, the Illinois Supreme Court has observed: "The special duty doctrine arose as a judicially created exception to the nonliability principles of the public duty rule, and is applicable in certain limited instances where a governmental entity has assumed a special relationship to an individual 'so as to elevate that person's status to something more than just being a member of the public.' " *Zimmerman*, 183 Ill. 2d at 32-33, citing *Schaffrath v. Village of Buffalo Grove*, 160 Ill. App. 3d 999, 1003 (1987). Thus, the public duty rule has not nullified section 15.1 of the ETS Act; plaintiffs who can establish an individual duty despite the rule may still sue for willful and wanton conduct.

Judy also urges us not to apply the public duty rule to the operation of a 911 emergency system. After carefully considering her argument in this regard, we conclude that the rule is applicable as discussed above.

## CONCLUSION

For these reasons, we affirm the summary judgment orders entered by the Bureau County circuit court.

Affirmed.

O'BRIEN and LYTTON, JJ., concur.