2019 IL App (1st) 170859

No. 1-17-0859

Fourth Division
May 30, 2019

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| DENNIS TZAKIS, ZENON GIL, CATHY PONCE, ZAIA GILIANA, JULIA CABRALES, and JUAN SOLIS, on Behalf of Themselves and All Other Persons Similarly Situated, a Proposed Class Action, | ) ) ) ) ) | |
| Plaintiffs-Appellants, | ) ) | Appeal from the Circuit Court of Cook County. |
| v. | ) ) | |
| BERGER EXCAVATING CONTRACTORS, INC.; ADVOCATE HEALTH AND HOSPITALS CORPORATION d/b/a Advocate Lutheran General Hospital; COOK COUNTY; GEWALT HAMILTON ASSOCIATES, INC.; THE VILLAGE OF GLENVIEW; MAINE TOWNSHIP; THE METROPOLITAN WATER RECLAMATION DISTRICT OF GREATER CHICAGO; THE VILLAGE OF NILES; and THE CITY OF PARK RIDGE, | ) ) ) ) ) ) ) ) ) ) ) | Nos.   2009 CH 6159         10 CH 38809         11 CH 29586         13 CH 10423         14 CH 6755         (cons.)  The Honorable Sophia H. Hall, Judge Presiding. |
| Defendants | ) ) | |
| (The Metropolitan Water Reclamation District of Greater Chicago, The City of Park Ridge, and Maine Township, | ) ) ) | |
| Defendants-Appellees). | ) ) | |

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice McBride and Justice Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1     The instant appeal arises from a lawsuit filed by plaintiffs concerning property damage to

their homes resulting from storm water flooding. Plaintiffs, who reside in Maine Township,

allege that defendant, Advocate Health and Hospitals Corporation (Advocate), which operates a hospital adjacent to plaintiffs' neighborhood, constructed its hospital in such a way that the hospital's storm water drainage system discharged onto plaintiffs' properties and caused flooding. Plaintiffs further allege that the local public entities, namely, the Village of Glenview (Glenview), Maine Township, the Metropolitan Water Reclamation District of Greater Chicago (District), the Village of Niles (Niles), and the City of Park Ridge (Park Ridge),[1] breached a variety of duties owed to the homeowners with respect to the drainage system. The defendants participating in the instant appeal—Park Ridge, the District, and Maine Township—sought dismissal of the complaint on the basis of the public duty rule, claiming that they did not owe a duty to any individual plaintiff but only to the community at large. In 2015, the trial court dismissed the complaint pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2014)), finding that the public duty rule applied. However, in 2016, the Illinois Supreme Court abolished the public duty rule in *Coleman v. East Joliet Fire Protection District*, 2016 IL 117952, and the trial court granted plaintiffs' motion to reconsider. Six months later, however, the trial court vacated its order and reinstated the dismissal. Plaintiffs now appeal, arguing that the supreme court's decision should be applied retroactively and the public duty rule is not available to defendants, and further arguing that no other basis existed for dismissing their complaint. For the reasons that follow, we affirm in part and reverse in part.

---

[1]Cook County was also named as a defendant, but plaintiffs voluntarily dismissed the counts aimed at the county without prejudice on April 25, 2013. Glenview was voluntarily dismissed from the case with prejudice on December 12, 2014. Niles is not a party to the instant appeal, but the trial court's dismissal expressly encompassed Niles, as well.

¶ 2                                    BACKGROUND

¶ 3        We considered the complaint with respect to defendant Advocate in *Tzakis v. Advocate Health & Hospitals Corp.*, 2015 IL App (1st) 142285-U. As it is the same complaint at issue in both appeals—plaintiffs' "amended fifth amended complaint"—we incorporate our prior description of the allegations where applicable in the instant appeal.

¶ 4        Plaintiffs filed their amended fifth amended complaint on January 20, 2012. According to the complaint, Park Ridge, Cook County, Maine Township, and the District, "among other local public entities," in coordination with private partners, developed the Prairie Creek Stormwater System, which was a manmade storm water system of drains, retention basins, and storm water sewers, and the local public entities controlled the development of the system beginning with the original 1960 plat approvals. The Prairie Creek Stormwater System received most of the storm water runoff within the Prairie Creek Watershed, a watershed of over one mile, extending upstream from plaintiffs' homes. Advocate acquired a parcel of real property adjacent to plaintiffs' neighborhood some time prior to 1976, which was also located within the watershed; as one of the parties admitted in oral argument, the property was on a flood plain. In 1976, Advocate submitted a development plan to Park Ridge that proposed modifications to Advocate's drainage system. Park Ridge approved the plans and they were subsequently implemented. In October 1976, the Illinois Department of Transportation issued a report stating that "a large portion of the subdivision set out in [Advocate's development plan]," including plaintiffs' neighborhood, "was and is subject to flood risks."

¶ 5        According to the complaint, in 1987, plaintiffs' neighborhood sustained catastrophic flooding, in response to which Park Ridge, Maine Township, and Glenview, "along with

other entities," hired Harza Engineering Services (Harza) to investigate the flooding. In 1990, Harza issued a report that identified design and maintenance defects in Advocate's drainage system, including the portions adjacent to plaintiffs' properties. The report indicated that these defects impaired the system's drainage capacity to a level "substantially below any reasonably safe standard." Plaintiffs allege that Harza's report placed Park Ridge, Maine Township, and Glenview and "possibly other [defendants]" on actual or constructive knowledge of the flood risk to plaintiffs' homes.

¶ 6        The complaint alleges that sometime after 1987 but before 2002, Advocate hired Gewalt Hamilton Associates, Inc. (Gewalt), an engineering firm, to draft and implement a development plan for the hospital property that included modifications to the drainage system and topography that altered the property's "natural drainage areas." In August 2002, a rainstorm caused storm water to accumulate within the hospital's drainage system. Plaintiffs allege that an "undersized" discharge component caused water to build up and "catastrophically overflow" the drainage system, again flooding plaintiffs' homes.

¶ 7        The complaint alleges that in 2002 or 2003, the Illinois Department of Natural Resources conducted a study in response to the 2002 flooding in conjunction with local municipal authorities, including Park Ridge, Maine Township, and Glenview. The study found "numerous bottlenecks and obstructions to flow as the causes of the invasive flooding." The study also detailed potential remedies, including specific improvements to Advocate's drainage system. After 2002 but before September 13, 2008, Advocate and Gewalt developed plans to modify the hospital property's drainage system, including components identified as problematic in the 2002 study. However, plaintiffs allege that, on information and belief, Advocate's plan did not include modifications to three undersized components of the

4

drainage system, despite Advocate's knowledge of the flood risk these components posed to plaintiffs. On September 13, 2008, storm water overwhelmed the hospital's drainage system and caused the flooding in plaintiffs' homes and property, leading to the instant lawsuit.[2]

¶ 8    With respect to the District, the complaint alleged that the District was the regional local public entity charged with multijurisdiction operation of storm water management and "owns and/or controls all drains, basins, structures, components and other stormwater improvements" within the Prairie Creek Stormwater System. The complaint further alleged that the District owned and operated the interceptors that received sewage from local sanitary sewers owned and controlled by Glenview and Park Ridge and transported it for treatment to one of the District's wastewater treatment plants. With respect to Park Ridge, the complaint alleged that Park Ridge had the most actual knowledge of Advocate flooding and was in the best position to make changes to Advocate's plans for its drainage system but failed to demand that Advocate make the necessary changes. The complaint further alleged that Park Ridge did not advise the District of the flooding problems and that Park Ridge deployed its police and/or department of public safety to the area during instances of flooding. With respect to Maine Township, the complaint alleged that the Maine Township Highway Department had mobilized and readied trucks for sand delivery to plaintiffs' neighborhood in anticipation of the September 13, 2008, flooding and had provided sandbags "[o]n many prior occasions" when there had been catastrophic flooding. The complaint further alleged that Maine Township was responsible for storm water management within its jurisdiction and supervised all storm water management projects and that, through its exercise of control,

---

[2]While the lawsuit at issue in the instant appeal is limited to the September 13, 2008, flooding, four other lawsuits were filed after subsequent flooding events; these four lawsuits were consolidated for all purposes with the instant lawsuit, and the trial court's dismissal expressly applied to all of the lawsuits.

Maine Township "owned possessed and/or controlled" the portions of the Prairie Creek Stormwater System within its jurisdiction.

¶ 9       The complaint alleged similar causes of action against all three defendants.[3] Counts XXV (against the District), XLV (against Park Ridge), and LXIV (against Maine Township) were for "negligence: dominant estate overburdening stormwater" and alleged that defendants knew or should have known of the foreseeable harm of invasive flooding into plaintiffs' neighborhood given the history of flooding, and that defendants owed nondelegable duties to properly manage the storm water so as to prevent harm to plaintiffs from excess storm water overburdening the drainage system. Counts XXXI (against the District), LII (against Park Ridge), and LXIX (against Maine Township) were for "negligent nuisance" and alleged that defendants negligently caused an accumulation of water from the drainage system to invade and interfere with plaintiffs' property. Counts XXXII (against the District), LIII (against Park Ridge), and LXX (against Maine Township) were for "negligent trespass" and alleged that, due to defendants' failure to properly manage the storm water systems, water invaded plaintiffs' property. Counts XXXVI (against the District), LVII (against Park Ridge), and LXXIV (against Maine Township) were for "statutory duty to maintain property" and alleged that section 3-102(a) of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/3-102(a) (West 2012)) set forth a duty for a local public entity to exercise ordinary care to maintain its property in a reasonably safe condition, which defendants did not do. Counts XXXVII (against the District), LVIII (against Park Ridge), and LXXV (against Maine Township) were for "duty to remedy dangerous plan" and alleged that section 3-103 of the Tort Immunity Act (745 ILCS 10/3-103 (West

---

[3]The complaint also contained a number of additional counts against defendants, but plaintiffs voluntarily dismissed several of them and, in response to defendants' motions to dismiss, indicated that they would be "proceeding only upon" the counts we discuss herein.

2012)) set forth a duty for a local public entity to correct known unsafe conditions related to the design and/or engineering of an approved plan, which defendants did not do. Counts XXXIX (against the District), LX (against Park Ridge), and LXXVI (against Maine Township) were for "taking real and personal property" and were based on article I, section 15, of the Illinois Constitution (Ill. Const. 1970, art. I, § 15), which prohibited the taking of private property for public use without the payment of just compensation.

¶ 10       On August 15, 2014, Park Ridge, the District, and Maine Township each filed motions to dismiss plaintiffs' amended fifth amended complaint.[4] Each of the motions to dismiss claimed that the complaint should be dismissed under section 2-615 of the Code because plaintiffs' claims were barred under the public duty rule and plaintiffs had failed to allege the existence of any duties owed to them. Each of the motions to dismiss further claimed that the complaint should be dismissed under section 2-619 of the Code because defendants were immune from liability pursuant to several sections of the Tort Immunity Act.

¶ 11       On April 3, 2015, the trial court granted defendants' motion to dismiss pursuant to section 2-615 based on the public duty rule. The court found that the public duty rule applied to all of defendants' alleged conduct, and that no special duty exception applied. Accordingly, the court found that plaintiffs had not alleged sufficient facts to infer the existence of an actionable duty on the part of defendants and granted the motions to dismiss.

¶ 12       On May 4, 2015, defendants filed a motion for a finding that there was no just reason to delay enforcement or appeal from the trial court's April 3, 2015, order. In response, plaintiffs

---

[4]The District and Maine Township each filed a combined motion to dismiss pursuant to section 2-619.1 of the Code (735 ILCS 5/2-619.1 (West 2012)), while Park Ridge filed two separate motions to dismiss, one based on section 2-615 (735 ILCS 5/2-615 (West 2012)) and one based on section 2-619 (735 ILCS 5/2-619 (West 2012)).

claimed that the trial court's order did not encompass its counts concerning the takings clause, and the parties engaged in briefing and oral argument on the issue.

¶ 13    On January 22, 2016, the Illinois Supreme Court issued a decision in *Coleman*, 2016 IL 117952, in which it abolished the public duty rule. On February 8, 2016, plaintiffs filed a motion for reconsideration of the dismissal of the complaint based on *Coleman*. Plaintiffs claimed that, as an interlocutory order, the trial court was permitted to review, modify, or vacate such an order at any time. In response, defendants argued that the new law established in *Coleman* should not be applied retroactively.

¶ 14    On August 18, 2016, the trial court granted plaintiffs' motion for reconsideration and vacated its April 3, 2015, order. Defendants filed a motion requesting that the trial court certify the issue for interlocutory appeal. On February 1, 2017, in its order on that motion, the trial court "on its own motion, reconsider[ed] its order of August 18, 2016." The court noted that, in their briefing on the issue of certification, defendants included arguments that had not been presented in the briefing on plaintiffs' motion to reconsider and found that "[t]hose additional arguments have persuaded this Court to vacate paragraph 1 of the August 18, 2016 order and reinstate its decision of April 3, 2015 dismissing [defendants]." The court found that the new law set forth in *Coleman* should not be retroactively applied to the instant case. The court noted that defendants had been raising the public duty rule since their initial motion to dismiss in 2010 and continued to raise the issue in subsequent motions to dismiss and found that retroactive application of the law would involve substantially more litigation preparation than could have been predicted. The court found that "[t]his is a hardship on the [defendants] and their taxpayers considering the unpredictable and unexpected reversal of longstanding law, the complexity of the case, and the passage of time."

8

¶ 15   On February 14, 2017, defendants filed a motion for a finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) that there was no just reason for delaying enforcement or appeal of the February 1, 2017, order reinstating the dismissal of plaintiffs' complaint with respect to defendants; this motion was granted on March 10, 2017. Plaintiffs filed a notice of appeal on April 4, 2017, and this appeal follows.

¶ 16                                    ANALYSIS

¶ 17   On appeal, plaintiffs claim that the trial court erred in finding that *Coleman* should not apply retroactively to their claims. Additionally, plaintiffs claim that, in the absence of the public duty rule, there was no alternate basis for dismissing their complaint.

¶ 18                              I. Standard of Review

¶ 19   The trial court's dismissal of plaintiffs' complaint was based on section 2-615 of the Code. A motion to dismiss under section 2-615 of the Code challenges the legal sufficiency of the complaint by alleging defects on its face. *Young v. Bryco Arms*, 213 Ill. 2d 433, 440 (2004); *Wakulich v. Mraz*, 203 Ill. 2d 223, 228 (2003). The critical inquiry is whether the allegations in the complaint are sufficient to state a cause of action upon which relief may be granted. *Wakulich*, 203 Ill. 2d at 228. A cause of action will not be dismissed on the pleadings unless it clearly appears that the plaintiff cannot prove any set of facts that will entitle it to relief. *Board of Directors of Bloomfield Club Recreation Ass'n v. The Hoffman Group, Inc.*, 186 Ill. 2d 419, 424 (1999). In making this determination, all well-pleaded facts in the complaint and all reasonable inferences that may be drawn from those facts are taken as true. *Young*, 213 Ill. 2d at 441. In addition, we construe the allegations in the complaint in the light most favorable to the plaintiff. *Young*, 213 Ill. 2d at 441. We review *de novo* an order granting a section 2-615 motion to dismiss. *Young*, 213 Ill. 2d at 440; *Wakulich*, 203

9

Ill. 2d at 228. *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011). Additionally, even if the trial court dismissed on an improper ground, a reviewing court may affirm the dismissal if the record supports a proper ground for dismissal. See *Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill. 2d 248, 261 (2004) (we can affirm "on any basis present in the record"); *In re Marriage of Gary*, 384 Ill. App. 3d 979, 987 (2008) ("we may affirm on any basis supported by the record, regardless of whether the trial court based its decision on the proper ground").

¶ 20        Additionally, each defendant also filed a motion to dismiss the amended fifth amended complaint pursuant to section 2-619 of the Code. A motion to dismiss under section 2-619 admits the legal sufficiency of all well-pleaded facts but allows for the dismissal of claims barred by an affirmative matter defeating those claims or avoiding their legal effect. *Janda v. United States Cellular Corp.*, 2011 IL App (1st) 103552, ¶ 83 (citing *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59 (2006)). When reviewing a motion to dismiss under section 2-619, "a court must accept as true all well-pleaded facts in plaintiffs' complaint and all inferences that can reasonably be drawn in plaintiffs' favor." *Morr-Fitz, Inc. v. Blagojevich*, 231 Ill. 2d 474, 488 (2008). Additionally, a cause of action should not be dismissed under section 2-619 unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to relief. *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 277-78 (2003). For a section 2-619 dismissal, our standard of review is *de novo. Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 579 (2006); *Morr-Fitz, Inc.*, 231 Ill. 2d at 488. As noted, *de novo* consideration means we perform the same analysis that a trial judge would perform. *Khan*, 408 Ill. App. 3d at 578.

¶ 21                                   II. Public Duty Rule

¶ 22        In the case at bar, as noted, the trial court's dismissal was based on its finding that defendants owed no duties to plaintiffs due to the public duty rule. Accordingly, it is helpful to begin with an overview of the public duty rule and the impact of the supreme court's 2016 decision in *Coleman*. The common law public duty rule provides that local governmental entities do not owe any duty to individual members of the general public to provide adequate governmental services, such as police and fire protection. *Coleman*, 2016 IL 117952, ¶ 37. "The long-standing public duty rule is grounded in the principle that the duty of the governmental entity to preserve the well-being of the community is owed to the public at large rather than to specific members of the community." (Internal quotation marks omitted.) *Coleman*, 2016 IL 117952, ¶ 38. An exception to this rule is the "special duty exception," where the local governmental entity owes a special duty of care to a particular individual that is different from the duty it owes to the general public. *Coleman*, 2016 IL 117952, ¶ 41.

¶ 23        In its analysis, the *Coleman* court traced the origins of the public duty rule to either an 1855 United States Supreme Court case or to an 1880 treatise on tort law. *Coleman*, 2016 IL 117952, ¶¶ 39, 40. The court further noted that the doctrine "was widely accepted in most jurisdictions." *Coleman*, 2016 IL 117952, ¶ 41. The *Coleman* court noted that the Illinois Supreme Court first acknowledged the public duty rule and its special duty exception in 1968. *Coleman*, 2016 IL 117952, ¶ 42. The court further noted that the public duty rule "existed '[i]ndependent[ly] of statutory or common-law concepts of sovereign immunity.' " *Coleman*, 2016 IL 117952, ¶ 44 (quoting *Huey v. Town of Cicero*, 41 Ill. 2d 361, 363 (1968)). The court, thus, noted that "[w]e have consistently held that the public duty rule survived the abolition of sovereign immunity and passage of the Tort Immunity Act."

*Coleman*, 2016 IL 117952, ¶ 52. Nevertheless, the *Coleman* court held that "the time has come to abandon the public duty rule and its special duty exception."[5] *Coleman*, 2016 IL 117952, ¶ 52. Accordingly, the court held that "in cases where the legislature has not provided immunity for certain governmental activities, traditional tort principles apply." *Coleman*, 2016 IL 117952, ¶ 61.

¶ 24     As an initial matter, in the case at bar, plaintiffs present shifting arguments concerning the applicability of the public duty rule to the creation and operation of municipal sewer and drainage systems. We note that most of these arguments are raised for the first time in plaintiffs' reply brief and, in some cases, at oral argument. It is well settled that points not argued in the appellant's brief are forfeited. *Lebron v. Gottlieb Memorial Hospital,* 237 Ill. 2d 217, 253 (2010); Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("Points not argued [in the appellant's brief] are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). Accordingly, any arguments not raised in plaintiffs' initial brief are not properly before this court. Nevertheless, we will briefly address some of those arguments below.

¶ 25     In their briefs, plaintiffs argue that the public duty rule is inapplicable because it is preempted by the Tort Immunity Act. However, our supreme court has repeatedly maintained that the public duty rule and the Tort Immunity Act may properly coexist. See, *e.g.*, *Coleman*, 2016 IL 117952, ¶ 52; *Zimmerman v. Village of Skokie*, 183 Ill. 2d 30, 45 (1998); *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 346 (1998); *Huey*, 41 Ill.

---

[5]While we refer to the "*Coleman* court," the decision in *Coleman* was a split one, with no majority opinion. Four justices concurred in the judgment, agreeing to abolish the public duty rule. However, the lead opinion was joined by the author and another justice, with two other justices joining in a special concurrence. Three justices dissented, believing that the public duty rule should not be abolished. For purposes of this appeal, however, the only relevant fact is that the public duty rule has been abolished.

2d at 363. Additionally, in their reply brief, plaintiffs argue that the public duty rule has "never been applied to [a local public entity] which actually owned the sewer or drain." (Emphases omitted.)[6] Even assuming *arguendo* that plaintiffs are correct, plaintiffs fail to explain the relevance of defendants' ownership of the pipes. We note that our supreme court has found that the distinction between a governmental unit's governmental and proprietary functions was abandoned upon the abolishment of sovereign immunity. *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 192 (1997). Accordingly, we cannot find that the ownership of the pipes would have any impact on the applicability of the public duty rule.[7] Plaintiffs then argue that operation of storm water sewer systems is not considered " 'flood prevention' or 'flood relief' services." Again, even assuming *arguendo* that plaintiffs are correct, it is irrelevant to the question of whether the public duty rule applies, as the rule is not limited to flood prevention or flood relief services. See, *e.g.*, *Harinek*, 181 Ill. 2d at 345 ("the public duty rule *** prevents [governmental] units from being held liable for their failure to provide adequate governmental services").

¶ 26     In their reply brief, plaintiffs next claim that the 1897 supreme court case of *City of Chicago v. Seben*, 165 Ill. 371 (1897), provides that "a [local public entity] acts ministerial without immunity when constructing, maintaining and operating sewers in executing its plan." However, whether a governmental entity's action is discretionary or ministerial is an issue with respect to application of the Tort Immunity Act, as plaintiffs themselves implicitly

---

[6] In their opening brief, plaintiffs also argue that the supreme court has never applied the public duty rule to "trespassory water invasion" as part of their argument for retroactive application of *Coleman*. We discuss that argument later in our analysis on the retroactivity issue.

[7] We note that our supreme court has suggested that an exception to the public duty rule may apply where the government is acting in a private, as opposed to a governmental, capacity. *Burdine v. Village of Glendale Heights*, 139 Ill. 2d 501, 508 (1990), *overruled in part on other grounds*, *McCuen v. Peoria Park District*, 163 Ill. 2d 125 (1994). However, plaintiffs do not claim that defendants in the case at bar were acting in a private capacity.

recognize through their reference to "immunity." Our supreme court has made clear that "[t]he existence of a duty and the existence of an immunity *** are separate issues." *Village of Bloomingdale v. CDG Enterprises, Inc.*, 196 Ill. 2d 484, 490 (2001); see also *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 370 (2003); *Harinek*, 181 Ill. 2d at 346; *Zimmerman*, 183 Ill. 2d at 46. The court first determines whether a duty exists, then addresses whether the governmental entity is immune from liability for a breach of that duty. *Village of Bloomingdale*, 196 Ill. 2d at 490; *Harinek*, 181 Ill. 2d at 346 ("the question of whether the City owed plaintiff a duty under the special duty doctrine has no bearing on the separate question of whether the [Tort Immunity] Act immunizes the City from liability for plaintiff's injuries"); *Zimmerman*, 183 Ill. 2d at 46 ("The distinction between an immunity and a duty is crucial, because only if a duty is found is the issue of whether an immunity or defense is available to the governmental entity considered ***."). Thus, whether an action is discretionary or ministerial has no impact on whether a duty exists in the first instance.

¶ 27    Moreover, plaintiffs' reliance on *Seben* shifted during oral argument. There, plaintiffs' counsel stated that "the public duty rule has been rejected by the supreme court explicitly in *Seben* in 1898 [*sic*] when they rejected the Michigan rule." As noted, points not argued in the appellant's brief are forfeited. *Lebron,* 237 Ill. 2d at 253; Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("Points not argued [in the appellant's brief] are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). Consequently, the argument plaintiffs raised for the first time at oral argument is not properly before this court. Furthermore, plaintiffs' counsel vastly overstated the *Seben* court's findings. In that case, the supreme court affirmed the trial court's refusal to give jury instructions providing that the City of Chicago could not be held liable for an injury caused by the plaintiff's stepping into a

sewer inlet where the sewer was constructed as part of a plan that was devised through no error in judgment. *Seben*, 165 Ill. at 383. The court found that the proposed jury instructions focused on only the initial construction of the sewer, and not on whether it was properly maintained. *Seben*, 165 Ill. at 383. In its discussion, the supreme court rejected the city's reliance on the "Michigan doctrine," which provided that where an injury was caused by the implementation of a plan that would render the work dangerous when completed, the fault lay with the legislature and that a "suit grounded upon it is grounded upon a wrong attributable to the legislative body itself." *Seben*, 165 Ill. at 380. The court further noted that Michigan had adopted the public duty rule—although it did not use that term—and did not draw a distinction between the liability of cities and the liability of towns and counties. *Seben*, 165 Ill. at 380.

¶ 28    The *Seben* court's discussion of these latter two points highlights the flaws with plaintiffs' characterization of the case at oral argument. As noted, *Seben* was decided in 1897, and the law in Illinois at that time was significantly different than it is today. As the *Coleman* court explained, the public duty rule originated in either 1855 or 1880, and our supreme court first expressly recognized the rule in 1968. *Coleman*, 2016 IL 117952, ¶¶ 39-40, 42. Thus, at the time that the *Seben* court issued its decision, the public duty rule itself was comparatively recent law, and the supreme court had never discussed it, much less "rejected" it "explicitly," as plaintiffs' counsel suggested at oral argument. Additionally, at that time, Illinois still retained local governmental tort immunity, which remained the state of the law until it was abolished in 1959. See *Coleman*, 2016 IL 117952, ¶¶ 30-33 (discussing the history of local governmental tort immunity). Thus, the liability of a local governmental entity established by the State differed from the liability of a municipality. *Coleman*, 2016 IL

117952, ¶¶ 33.[8] In its analysis, the *Seben* court appropriately made note of these differences from Michigan law, which recognized the public duty rule and did not maintain local governmental tort immunity, in determining that the appellant's arguments advocating for the "Michigan doctrine" were not persuasive. *Seben*, 165 Ill. at 380. This in no way suggests, however, that the *Seben* court was considering the issue of the public duty rule—or local governmental tort immunity, for that matter—and "reject[ing]" it. Furthermore, even if the case could be interpreted in that way, any "reject[ion]" of the public duty rule would have only lasted until 1968, when the supreme court expressly recognized the rule in *Huey v. Town of Cicero*, 41 Ill. 2d 361, 363 (1968).

¶ 29        Finally, plaintiffs' counsel at oral argument also claimed that the public duty rule has never been applied to a "public improvement." Again, as this argument was first raised at oral argument, it is not properly before this court. Moreover, as we noted with respect to plaintiffs' earlier arguments, plaintiffs' focus on whether a particular category of governmental service has or has not been considered with respect to the application of the public duty rule is not dispositive of the issue. Our supreme court has made clear that "[t]he public duty rule is a long-standing precept which establishes that a governmental entity and its employees owe no duty of care to individual members of the general public to provide governmental services, such as police and fire protection." *Zimmerman*, 183 Ill. 2d at 32. Courts have applied this rule to a variety of "governmental services." See *DeSmet v. County of Rock Island*, 219 Ill. 2d 497, 508 (2006) (noting that the rule has been applied "in various contexts" (citing *Sims-Hearn v. Office of the Medical Examiner*, 359 Ill. App. 3d 439, 443-46

---

[8] The *Coleman* court suggested that the existence of local governmental tort immunity explained the lack of earlier cases discussing the public duty rule—while the immunity existed, the public duty rule "remained in abeyance," since the immunity stood as an absolute bar to the enforcement of any civil liability arising from a breach of any duty. *Coleman*, 2016 IL 117952, ¶ 42.

(2005), and *Alexander v. Consumers Illinois Water Co.*, 358 Ill. App. 3d 774 (2005))). For instance, the public duty rule has been applied to bar liability for "a general duty to the public to prevent *** sewer back-ups" (*Alexander*, 358 Ill. App. 3d at 779), for performance of autopsies (*Sims-Hearn*, 359 Ill. App. 3d at 445), for administration of a 911 emergency telephone system (*Donovan v. Village of Ohio*, 397 Ill. App. 3d 844, 850 (2010)), for failure to administer a vaccine (*Taylor v. Bi-County Health Department*, 2011 IL App (5th) 090475, ¶ 36), and for failure to properly inspect a porch that subsequently collapsed (*Ware v. City of Chicago*, 375 Ill. App. 3d 574, 581 (2007)). Thus, it is apparent that the public duty rule has been found applicable to a wide variety of governmental services.

¶ 30     Nevertheless, based on our research, plaintiffs' counsel appears to be correct in the claim that the public duty rule has not been considered in the context of a public improvement. The closest analogue would be in *Alexander*, where the court applied the public duty rule in the context of the village's duty to prevent sewer back-ups. *Alexander*, 358 Ill. App. 3d at 779. We also note that the Seventh Circuit, applying Illinois law, has observed in *dicta* that there is no duty to provide uninterrupted water service for firefighting purposes. *Remet Corp. v. City of Chicago*, 509 F.3d 816, 820 (7th Cir. 2007). Thus, there are arguments to be made concerning whether the public duty rule is appropriate in considering the governmental entity's duty with respect to such improvements, given the lack of case law on the issue, and the issue could have been further developed by both parties had plaintiffs properly raised it on appeal. However, we have no need to reach an answer to the question of the applicability of the public duty rule because our conclusion on the issue of retroactivity is dispositive. We turn, then, to consideration of that question.

¶ 31     We note that this appears to be a case of first impression, as we have discovered no case law expressly considering the retroactive applicability of *Coleman*. There is one case, involving storm water runoff and flooding, in which the public duty rule has been raised post-*Coleman*. See *Salvi v. Village of Lake Zurich*, 2016 IL App (2d) 150249. However, after noting that the defendant village had invoked the public duty rule, the court in that case simply noted that "our supreme court has recently abolished the public duty rule" and proceeded to consider the defendant's arguments under the Tort Immunity Act without any discussion of whether the new law should apply retroactively. *Salvi*, 2016 IL App (2d) 150249, ¶ 37. Thus, from our research, we are the first court to consider whether *Coleman* should apply retroactively.

¶ 32     Generally, when a court issues an opinion, its decision is presumed to apply both retroactively and prospectively. *Tosado v. Miller*, 188 Ill. 2d 186, 196 (1999). However, our supreme court has set forth two ways for that presumption to be overcome. *Aleckson v. Village of Round Lake Park*, 176 Ill. 2d 82, 86 (1997). First, the presumption is overcome when a court expressly states that its decision will be applied prospectively only. *Tosado*, 188 Ill. 2d at 196-97. Second, "a later court may, under certain circumstances, override the presumption by declining to give the previous opinion retroactive effect, at least with respect to the parties appearing before the later court." *Aleckson*, 176 Ill. 2d at 86. This authority is not limited to the supreme court; an appellate court has the authority to determine whether a previous decision should be applied prospectively with respect to a case before it. *Aleckson*, 176 Ill. 2d at 91; see also *Aleckson*, 176 Ill. 2d at 89 (noting that the supreme court had previously implicitly recognized this authority when it cited an appellate court's prospective application of Illinois Supreme Court and United States Supreme Court case law).

¶ 33        Our supreme court has identified three factors in determining the question of prospective application:

> "(1) whether the decision to be applied nonretroactively established a new principle of law, either by overruling clear past precedent on which litigants may have relied or by deciding an issue of first impression whose resolution was not clearly foreshadowed; (2) whether, given the purpose and history of the new rule, its operation will be retarded or promoted by prospective application; and (3) whether substantial inequitable results would be produced if the former decision is applied retroactively." *Tosado*, 188 Ill. 2d at 197 (citing *Aleckson*, 176 Ill. 2d at 92-94).

¶ 34        In the case at bar, the *Coleman* court did not expressly address whether its decision would be prospective only. Plaintiffs claim that, because the *Coleman* dissent made reference to a case in which the court considered the retroactive application of a statutory amendment, the fact that the *Coleman* court did not specifically address the prospective application of the new law "buttresses the conclusion that the *Coleman* Court intentionally chose not to give prospective only effect." We find this argument unpersuasive. First, the case was one of nine cases cited in a string cite to support the dissenting justice's argument that the supreme court routinely engaged in an " 'even if' approach to decisionmaking" by deciding dispositive issues first in the interests of judicial expediency. *Coleman*, 2016 IL 117952, ¶ 85 (Thomas, J., dissenting, joined by Garman, C.J., and Karmeier, J.). Additionally, the case cited by the dissent concerned the retroactive effect of a statute, not a court decision, which is subject to an entirely different analysis. See, *e.g.*, *People v. Hunter*, 2017 IL 121306 (discussing standards to be applied in determining retroactive effect of statutory amendment). Thus, we cannot find that the mere use of the words "prospectively" and "retroactively" in a

19

parenthetical in this string cite in any way indicates that "certainly bells went off in the minds of the seven justices as to whether prospective only application of *Coleman* should be given." The court was silent on the issue. All that this silence indicates is that the presumption of retroactivity has not been overcome by an express statement by the court.

¶ 35    Thus, we must consider whether the factors set forth in *Aleckson* lead us to give the law announced in *Coleman* retroactive effect. As noted, the first factor is whether the decision established a new principle of law, either by overruling clear past precedent on which litigants have relied or by deciding an issue of first impression whose resolution was not clearly foreshadowed. *Aleckson*, 176 Ill. 2d at 92. We agree with defendants that *Coleman* clearly established a new principle of law. The court was explicit in the fact that it was doing so and was overruling past precedent; the lead opinion contains a discussion of *stare decisis* and the dissent also focuses its analysis on that issue. See *Coleman*, 2016 IL 117952, ¶¶ 53-54 (lead opinion); *Coleman*, 2016 IL 117952, ¶¶ 84-96 (Thomas, J., dissenting, joined by Garman, C.J., and Karmeier, J.). Most clearly, all three opinions in that case refer to the outcome as "abandon[ing]" or "abolish[ing]" the public duty rule. See *Coleman*, 2016 IL 117952, ¶ 52 (lead opinion) ("the time has come to abandon the public duty rule and its special duty exception"); *Coleman*, 2016 IL 117952, ¶ 54 ("We believe that departing from *stare decisis* and abandoning the public duty rule and its special duty exception is justified for three reasons ***."); *Coleman*, 2016 IL 117952, ¶ 61 ("we hereby abolish the public duty rule and its special duty exception"); *Coleman*, 2016 IL 117952, ¶ 64 ("We abolish the public duty rule and its special duty exception."); *Coleman*, 2016 IL 117952, ¶ 67 (Freeman, J., specially concurring, joined by Theis, J.) ("the time has come for this court to abandon the public duty rule and its special duty exception"); *Coleman*, 2016 IL 117952, ¶ 77 ("I agree

that the public duty rule and its special duty exception must be abolished"); *Coleman*, 2016 IL 117952, ¶ 80 (Thomas, J., dissenting, joined by Garman, C.J., and Karmeier, J.) ("Today the court abandons these well-settled principles and abolishes the public duty rule."); *Coleman*, 2016 IL 117952, ¶ 96 ("I find no compelling legal rationale to overrule this precedent and abolish the public duty rule.") There is no way to read *Coleman* without concluding that the supreme court was making new law by overturning longstanding precedent.

¶ 36    Plaintiffs argue that *Coleman* did not announce a new rule because the supreme court had never previously applied the public duty rule to water-damage litigation and because the supreme court in *Coleman* described the jurisprudence concerning the rule to be "muddled and inconsistent," meaning that the past precedent was not "clear." We do not find these arguments persuasive. First, the question we must answer is not whether *Coleman* established a new principle of law in the specific context of water-damage litigation; the question is whether *Coleman* established a new principle of law, period. As noted, the *Coleman* court clearly and expressly overruled what it termed "a long-standing common-law rule" (*Coleman*, 2016 IL 117952, ¶ 42 (lead opinion)). Additionally, the fact that the supreme court has not spoken on a particular issue does not mean that litigants are acting in a vacuum; appellate court and trial court decisions can provide guidance as to the current state of the law even in the absence of a supreme court ruling on a particular factual scenario. For instance, in the case at bar, several appellate court cases, both reported and unreported,[9] supported defendants' claim that the public duty rule would apply to water-damage litigation.

_____

[9]While, of course, unreported decisions cannot be cited by the parties and have no precedential value, even unreported cases are publicly available and their existence can guide attorneys seeking to draft the best arguments to advance their clients' positions and permits them to view analysis found persuasive by other courts.

See, *e.g.*, *Town of Cicero v. Metropolitan Water Reclamation District of Greater Chicago*, 2012 IL App (1st) 112164, ¶ 41 n.4 (suggesting without deciding that the public duty rule would appear to bar claims concerning adequacy of storm management against the District); *Alexander*, 358 Ill. App. 3d at 779 (finding that the public duty rule would bar village's liability for sewage system back-ups); *Remet Corp.*, 509 F.3d at 820 (in *dicta*, observing that the public duty rule meant that the city had no duty to provide uninterrupted water service for firefighting purposes). Additionally, in support of its motion to dismiss, the District attached six trial court decisions in storm management and sewer-backup cases in which it had been a defendant, all of which dismissed the plaintiffs' claims against the District due to the public duty rule. Thus, it was eminently reasonable for defendants to rely on the public duty rule in challenging plaintiffs' claims against them, and there is no basis for claiming that *Coleman* did not represent a change in law by "overruling clear past precedent on which litigants have relied." *Aleckson*, 176 Ill. 2d at 92.

¶ 37    We are also unpersuaded by plaintiffs' argument that past precedent was not "clear" because the primary opinion in *Coleman* referred to the jurisprudence concerning the public duty rule as "muddled and inconsistent." First, we note that the opinion in which this language appears was joined by only one justice in addition to the author, meaning that it does not carry the weight of a majority—or even a plurality—opinion. Additionally, the reason the opinion characterized the jurisprudence in that way was based on the interaction between the public duty rule and statutory immunities. See *Coleman*, 2016 IL 117952, ¶¶ 55-57. The opinion did not indicate that the *existence* of the public duty rule itself was not

"clear." Accordingly, we find that, under the first factor, the *Coleman* court established a new principle of law by overruling clear past precedent on which litigants have relied.[10]

¶ 38    The second factor we must consider is "whether, given the purpose and history of the new rule, its operation will be retarded or promoted by prospective application." *Tosado*, 188 Ill. 2d at 197. As noted, the ultimate holding of *Coleman*—the abolition of the public duty rule—was the result of two opinions, each of which was joined by two justices. Thus, it is difficult to glean any overarching "purpose and history of the new rule" (*Tosado*, 188 Ill. 2d at 197). The primary opinion provided three reasons for abolishing the public duty rule:

> "(1) the jurisprudence has been muddled and inconsistent in the recognition and application of the public duty rule and its special duty exception; (2) application of the public duty rule is incompatible with the legislature's grant of limited immunity in cases of willful and wanton misconduct; and (3) determination of public policy is primarily a legislative function and the legislature's enactment of statutory immunities has rendered the public duty rule obsolete." *Coleman*, 2016 IL 117952, ¶ 54.

By contrast, the specially concurring opinion reasoned that the public duty rule should be abolished because it was predicated on the same basis as the concepts underlying local governmental immunity and, when the constitution was amended to abolish all forms of

---

[10]Plaintiffs also argue that *Coleman* did not establish new law because the Tort Immunity Act "foreshadowed the abolition" of the public duty rule. Leaving aside the fact that *Coleman* court expressly recognized that "[w]e have consistently held that the public duty rule survived the abolition of sovereign immunity and passage of the Tort Immunity Act" (*Coleman*, 2016 IL 117952, ¶ 52), we have no need to address this argument. The first factor asks whether the new decision established a new principle of law "*either* by overruling clear past precedent on which litigants have relied *or* by deciding an issue of first impression whose resolution was not clearly foreshadowed." (Emphases added.) *Aleckson*, 176 Ill. 2d at 92. As noted, we have determined that the first applies—the court overruled clear past precedent on which litigants had relied—and so we have no need to discuss the second, other than to observe that it would appear almost impossible for something to be "an issue of first impression" when it is expressly overruling long-standing law.

nonstatutory governmental immunity, "the judiciary's power to apply the public duty doctrine ceased to exist as a means of assessing municipal tort liability." *Coleman*, 2016 IL 117952, ¶ 68 (Freeman, J., specially concurring, joined by Theis, J.).

¶ 39   In the case at bar, defendants argue that, under the facts of the instant case, a prospective application of the new law set forth in *Coleman* would not frustrate the concerns set forth by the *Coleman* court. First, they note that the litigation history of this case renders it unique—the flooding occurred in 2008, and defendants first asserted the application of the public duty rule in 2010 and continued asserting it through the filing of a number of amended complaints, culminating in the amended fifth amended complaint. They finally obtained a dismissal on that basis on April 3, 2015, five years after they first asserted the applicability of the public duty rule. Had they obtained a dismissal when they first sought it in 2010, the judgment would have been final and appealable well prior to the supreme court's January 22, 2016, decision in *Coleman* and we would not be considering the applicability of the public duty rule today.[11]

¶ 40   Our supreme court in *Aleckson* found that where the court below "noted that it was applying [the new law] prospectively to the parties because the facts of the instant case and its timing *vis a vis* [the case establishing the new law] are so unique" that "the nonretroactive application was expressly limited to the facts of the case and could not have 'retarded' the future operation of" the new case. (Internal quotation marks omitted.) *Aleckson*, 176 Ill. 2d at 93. Similarly, in the case at bar, the facts of the instant case and its timing *vis-à-vis Coleman* is unique; it is only through an accident of timing that *Coleman* was decided while this case

_____

[11]However, we note that a decision normally has retroactive application to any causes pending at the time the decision is announced, including cases on appeal in the appellate court. *Heastie v. Roberts*, 226 Ill. 2d 515, 535 (2007). Thus, if the case had been pending on appeal, plaintiffs could have conceivably raised the retroactivity issue at that point.

was still active before the trial court. This would weigh in favor of a nonretroactive application of *Coleman*.

¶ 41    Defendants further argue that a nonretroactive application of *Coleman* in the instant case would also have limited impact due to the statute of limitations. Under the Tort Immunity Act, any civil action against a local governmental entity must be commenced within one year from the date that the cause of action accrued.[12] 745 ILCS 10/8-101(a) (West 2016). Thus, any claim against a local governmental entity that is filed subsequent to our opinion must have accrued no earlier than May 2018. By May 2018, *Coleman* and its abolition of the public duty rule was settled law. A finding that the new law does not apply to the instant action would have no impact on such a lawsuit, which would be filed well after the date the law had changed. Thus, the only impact a nonretroactive finding could have would be upon cases that are currently pending before the trial or appellate courts, which would be a small subset of cases at most, if any.

¶ 42    However, we must also note the existence of *Salvi*, in which the Second District applied the new law set forth in *Coleman* retroactively. *Salvi*, 2016 IL App (2d) 150249, ¶ 37. There, the flooding at issue occurred in 2013 (*Salvi*, 2016 IL App (2d) 150249, ¶ 13), the plaintiff's amended complaint was filed in 2014 (*Salvi*, 2016 IL App (2d) 150249, ¶ 3), and the defendant village raised the issue of the public duty rule in a motion to dismiss (*Salvi*, 2016 IL App (2d) 150249, ¶ 20). Thus, as in the case at bar, the flooding, the lawsuit, and the motion to dismiss based on the public duty rule all predated *Coleman*.[13] Despite these facts,

---

[12]The exception is for actions for damages based on injury or death arising out of patient care, which have a two-year statute of limitations. 745 ILCS 10/8-101(b) (West 2016).

[13]Although the opinion does not indicate the date of the defendant village's motion to dismiss, we know that the motion was also filed prior to the 2016 *Coleman* decision because the appeal in *Salvi* was filed in 2015, as evidenced by the appeal number. Thus, *Coleman* would have been decided while the *Salvi* appeal was pending.

the *Salvi* court applied the new law retroactively. *Salvi*, 2016 IL App (2d) 150249, ¶ 37. As noted, the *Salvi* court did not engage in a discussion of whether the law should be applied retroactively or prospectively; thus, we have no way of knowing what arguments were raised before it by the defendant village. Nevertheless, the fact remains that the *Salvi* court did expressly apply *Coleman* to the case before it. *Salvi*, 2016 IL App (2d) 150249, ¶ 37 ("[O]ur supreme court has recently abolished the public duty rule. [Citation.] Thus, we will proceed to the Tort Immunity Act.").

¶ 43    The existence of *Salvi* is relevant to the instant discussion because a prospective application of *Coleman* to the instant case would mean that two cases with similar facts would be applying two different versions of the law. We are not obligated to follow the *Salvi* court's decision if we disagree with it. See *Deutsche Bank National Trust Co. v. Iordanov*, 2016 IL App (1st) 152656, ¶ 44. However, in considering the second factor of the retroactivity analysis, reaching a decision that would lead to conflicting case law would appear to feed into the "muddled and inconsistent" jurisprudence surrounding the public duty rule that was of concern to several justices in deciding *Coleman*. See *Coleman*, 2016 IL 117952, ¶ 54. Thus, while it would not hinder the operation of the new law, a prospective application of *Coleman* in the instant case would certainly not promote the operation of the new law and could even lead to an increase in the uncertainty surrounding the application of the rule.

¶ 44    The final factor to be considered is "whether substantial inequitable results would be produced if the former decision is applied retroactively." *Aleckson*, 176 Ill. 2d at 93. In the case at bar, the trial court found that "[t]he retroactive application of the *Coleman* decision dramatically changes the considerations concerning the possible course of litigation of the

instant case in the future." On appeal, defendants focus on similar considerations in arguing that the equities favor a prospective application of the new law. Defendants claim that they have "endured nine years of litigation and risk exposure, waiting patiently for their time to be heard on the Public Duty Rule, and now must contend with the Supreme Court's abolishment of the Public Duty Rule altogether," which they argue is "not fair." Defendants further claim that if *Coleman* applies retroactively, they will be forced to reevaluate defense and indemnity exposure and will endure significant litigation costs and time commitments that they otherwise would not have needed to endure. Certainly, if *Coleman* is applied to their case, defendants will undergo significant hardship. Any additional litigation necessarily involves additional time and expense. This additional expense is especially fraught when dealing with a governmental entity, as it is taxpayers, not a private party, who are responsible for the expenses. As the trial court noted:

> "The consequence to the [defendants] of the abolition of the Public Duty Rule as a defense is financial. Every public entity has a responsibility to its taxpayers to estimate budgets and to tax its citizens reasonably. Predicting legal expenses is difficult because the entity does not know whether litigation will be filed. Once filed, the entity then must budget for the potential expenses of the litigation based on a prediction of the legal and factual issues which might be involved. Legal issues, to be determined based on facts alleged in pleadings taken as true, such as the application of the Public Duty Rule, involve different legal expenses than the expenses necessary to prepare for class certification, prove the availability of immunities under the Tort Immunity Act, and defend against assertions of wrongdoing."

¶ 45    In the case at bar, at the time of the flooding, at the time of the filing of the complaint, and at the time of dismissal of the amended fifth amended complaint, defendants were operating in a legal universe that included the availability of the public duty rule and governed their actions accordingly. Then, the supreme court overruled long-standing precedent—which it had expressly reaffirmed as recently as 1998—and abolished that rule, shifting the legal ground on which defendants stood. "Local government officials, like other people, are entitled to rely on [existing law] when 'making decisions and in shaping their conduct.' " *Board of Commissioners of the Wood Dale Public Library District v. County of Du Page*, 103 Ill. 2d 422, 429 (1984) (quoting *Lemon v. Kurtzman*, 411 U.S. 192, 199 (1973)). By applying the new law retroactively, defendants and their taxpayers would be forced to incur additional unexpected expenses in litigating this case, which could prove substantial, as it has been pending for 10 years to date and has yet to proceed beyond the pleading stage.

¶ 46    However, we note that these additional expenses and time commitments are not necessarily predicated solely on *Coleman*. Defendants' argument presupposes that their actions were, in fact, covered by the public duty rule. Under defendants' argument, in the absence of *Coleman*, the public duty rule would apply, marking the end of litigation. However, that overlooks the fact that it is not beyond dispute that the public duty rule would, in fact, apply. Plaintiffs likely would have appealed the trial court's April 3, 2015, dismissal even in the absence of *Coleman*, and we would have been asked to determine whether the public duty rule applies to the circumstances present in the case at bar. As discussed earlier in our analysis, this is not a question that has been considered by our supreme court, nor is it an area that has a clear answer at the appellate level. If plaintiffs had prevailed in that appeal,

defendants would find themselves in exactly the same position as they are now—forced to litigate the remainder of the case. Thus, while we recognize defendants' understandable frustration at the unexpected change in the legal universe, the additional expenses that would be incurred by continuing to litigate the instant case should not have been entirely unexpected, as defendants should have been prepared for the contingency of a loss on appeal.

¶ 47     Plaintiffs, by contrast, argue that a prospective application of *Coleman* would be inequitable to them because they would lose the ability to have their day in court. We note that, unlike in the case relied on by plaintiffs, *Oak Grove Jubilee Center, Inc. v. City of Genoa*, 347 Ill. App. 3d 973 (2004), this is not a case in which the plaintiff had a viable cause of action that would be lost by retroactive application of the new law. Here, plaintiffs had a cause of action that had already been dismissed, which would be revived by the retroactive application of the new law. In either case, though, the question is the same: applying the new law one way results in an active lawsuit, while applying it the other way results in the termination of that lawsuit. Thus, our decision has very real consequences to plaintiffs, as well as to defendants. We also note that, in some respects, plaintiffs are a victim of timing in much the same way as defendants are—if the supreme court had abolished the public duty rule earlier, defendants would not have been able to raise the rule in response to plaintiffs' complaint and the complaint would not have been dismissed on that basis. Thus, there are equitable arguments to be made on both sides of the equation.

¶ 48     In considering the three factors, there is no clear-cut answer on either side. The only clear answer is with respect to the first factor: *Coleman* made new law by abolishing the public duty rule. With respect to the second factor, prospective application of the new rule would have minimal impact on the rule's future applicability, as the unique facts of the instant case

and the Tort Immunity Act's statute of limitations necessarily limit the scope of our holding. However, prospective application would result in a direct conflict with the Second District, given its retroactive application of *Coleman* in *Salvi*, which would further muddy the jurisprudence concerning the applicability of the public duty rule. Finally, with respect to the third factor, retroactive application of the new law would cause hardship to defendants and their taxpayers, as defendants relied on the long-standing law concerning the existence of the public duty rule and their taxpayers would be forced to absorb the additional litigation costs. On the other hand, such additional litigation costs should not be entirely unexpected, as defendants should have been prepared for the contingency of a loss on appeal even if the public duty rule remained in effect. By contrast, prospective application of the new law would result in plaintiffs being prevented from pursuing their claims against defendants. Thus, there are equitable considerations in favor of both parties.

¶ 49    As noted, when a court issues an opinion, its decision is presumed to apply both retroactively and prospectively, unless that presumption is overcome by either an express statement by the court or through the consideration of the factors set forth in *Aleckson*. *Tosado*, 188 Ill. 2d at 196-97. Here, there is no express statement by the supreme court and the *Aleckson* factors do not tilt in any one direction. Consequently, we cannot find that the presumption of retroactivity has been overcome, and therefore, the new law set forth in *Coleman* should have been applied retroactively to the instant case. Accordingly, the trial court erred in limiting the new law set forth in *Coleman* to apply only prospectively to the instant case, and we must reverse the trial court's dismissal of plaintiffs' complaint based on the public duty rule.

¶ 50                                    III. Alternate Bases

¶ 51        Our decision concerning the public duty rule does not end our analysis, however, because

we may affirm the trial court's dismissal on any basis supported by the record, even if the

trial court did not base its decision on that ground. See *Raintree Homes*, 209 Ill. 2d at 261

(we can affirm "on any basis present in the record"); *In re Marriage of Gary*, 384 Ill. App. 3d

at 987 ("we may affirm on any basis supported by the record, regardless of whether the trial

court based its decision on the proper ground"). In the case at bar, plaintiffs alleged causes of

action based on the Tort Immunity Act, based on the common law, and based on the Illinois

Constitution. We consider each of these counts in turn, discussing whether they should have

been dismissed under section 2-615 of the Code. If any of these counts should have survived

dismissal based on section 2-615, we then consider whether they should have been dismissed

under section 2-619.

¶ 52        As an initial matter, defendants make an overarching argument concerning all of

plaintiffs' counts that are based on negligence—they claim that plaintiffs failed to plead that

defendants' conduct proximately caused plaintiffs' damages. Since this argument applies to

many of plaintiffs' causes of action, we address it first. "To recover damages based upon a

defendant's alleged negligence, a plaintiff must allege and prove that the defendant owed a

duty to the plaintiff, that defendant breached that duty, and that the breach was the proximate

cause of the plaintiff's injuries." *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252,

256 (1999) (citing *Thompson v. County of Cook*, 154 Ill. 2d 374, 382 (1993)). Our supreme

court has explained the proximate cause element as follows:

        "The proximate cause element is a factual question for the jury to decide and has

            two components: cause in fact and legal cause. [Citations.] 'Cause in fact' is

                                            31

established where there is reasonable certainty that the injury would not have occurred 'but for' the defendant's conduct or where a defendant's conduct was a 'substantial factor' in bringing about the harm. [Citation.] Legal cause, however, is essentially a question of policy, *i.e.*, 'How far should a defendant's legal responsibility extend for conduct that did, in fact, cause the harm?' (Internal quotation marks omitted.) [Citation.] Legal cause, therefore, is established only when it can be said that the injury was reasonably foreseeable. [Citations.]" *Stanphill v. Ortberg*, 2018 IL 122974, ¶ 34.

¶ 53        In the case at bar, defendants claim that plaintiffs failed to allege the "cause in fact" component of proximate cause. In support, they point to the trial court's dismissal of a negligence count against Gewalt, the engineering firm that worked with Advocate to develop a drainage plan in 2002; in that dismissal, the court found that plaintiffs had not alleged that Gewalt's conduct after 2002 was a cause in fact in bringing about the September 2008 flooding. However, Gewalt's position in the litigation differs quite significantly from defendants' position. Indeed, in its dismissal, the trial court specifically pointed to the fact that "plaintiffs alleged a host of other components of the [Prairie Creek Stormwater System] that contributed to the 2008 flooding, all of which existed prior to Gewalt's post-2002 designs on the Dempster Basin." Plaintiffs' allegations against defendants go far beyond the 2002 allegations against Gewalt. They allege that plaintiffs were involved in approving the drainage and sewer systems as far back as the 1960s and were aware of the undersized drainage capacity of certain portions of the systems. They further allege that defendants approved of Advocate's flawed plans for its drainage system and that defendants nevertheless approved them. Finally, they allege that defendants were aware of the serious design and

maintenance defects with the Prairie Creek Stormwater System based on the persistent flooding and failed to remedy those defects or to take measures to prevent the flooding. Thus, we cannot agree with defendants that plaintiffs have failed to allege sufficient facts that defendants' conduct was a "cause in fact" of plaintiffs' damages. Instead, at least at this stage of the proceedings, plaintiffs' allegations are sufficient to withstand a motion to dismiss. We turn, then, to consideration of each of plaintiffs' causes of action individually.

¶ 54                                    A. Tort Immunity Act Counts

¶ 55        With respect to the Tort Immunity Act, plaintiffs set forth causes of action for statutory duties pursuant to sections 3-102(a) and 3-103 of the Tort Immunity Act. Plaintiffs alleged that defendants breached a duty to maintain their property in a reasonably safe condition pursuant to section 3-102(a) and that defendants breached their duty to correct known unsafe conditions relating to the design of the Prairie Creek Stormwater System pursuant to section 3-103 by not compelling Advocate to redesign its drainage plans.

¶ 56                                          1. Section 3-102(a)

¶ 57        Section 3-102(a) of the Tort Immunity Act provides:

> "Except as otherwise provided in this Article, a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom the entity intended and permitted to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used, and shall not be liable for injury unless it is proven that it has actual or constructive notice of the existence of such a condition that is not reasonably safe in reasonably adequate time prior to an injury to have taken measures to remedy or protect against such condition." 745 ILCS 10/3-102(a) (West 2012).

33

In counts XXXVI (against the District), LVII (against Park Ridge), and LXXIV (against Maine Township), plaintiffs alleged that defendants breached a "statutory duty to maintain property" pursuant to this section. Defendants argue that these counts were properly dismissed because there is no such "statutory duty to maintain property."

¶ 58    Defendants are correct that the Tort Immunity Act does not create any new duties. Our supreme court has made clear that "[t]he Tort Immunity Act grants only immunities and defenses; it does not create duties." *Village of Bloomingdale*, 196 Ill. 2d at 490; see also *Barnett v. Zion Park District*, 171 Ill. 2d 378, 386 (1996) ("It is settled that the Tort Immunity Act does not impose on a municipality any new duties."). Instead, "the [Tort Immunity] Act merely codifies those duties existing at common law, to which the subsequently delineated immunities apply." *Barnett*, 171 Ill. 2d at 386; *Monson v. City of Danville*, 2018 IL 122486, ¶ 24 ("the courts of this state have uniformly held that section 3-102(a) merely codifies the common-law duty of a local public entity to maintain its property in a reasonably safe condition"). Thus, a court must look to the common law and other statutes to determine whether the defendant owes the plaintiff a duty. *Barnett*, 171 Ill. 2d at 386. Once the court determines that a duty exists, then it examines whether the Tort Immunity Act provides immunity for a breach of that duty. *Village of Bloomingdale*, 196 Ill. 2d at 490. "In other words, because the Act implicitly recognizes duties which already exist at common law, we may refer to the common law to determine the duties a local public entity holds. But to determine whether that entity is liable for the breach of a duty, we look to the Tort Immunity Act, not the common law." *Village of Bloomingdale*, 196 Ill. 2d at 490.

¶ 59    In the case at bar, plaintiffs have styled these counts as arising under a "statutory duty to maintain property," which suggests that the basis of the duty is the statute, not the common

34

law. It is on this basis that defendants argue that the counts should be dismissed. However, our supreme court "has emphasized that 'the character of the pleading should be determined from its content, not its label.' " *In re Parentage of Scarlett Z.-D.*, 2015 IL 117904, ¶ 64 (quoting *In re Haley D.*, 2011 IL 110886, ¶ 67). Thus, the title of the count does not control over the substance of its claim. *Papadakis v. Fitness 19 IL 116, LLC*, 2018 IL App (1st) 170388, ¶ 32. Here, the substance of these counts of the complaint can be interpreted as alleging negligence based on a breach of defendants' common-law duty to maintain their property in a reasonably safe condition.

¶ 60    However, plaintiffs have foreclosed this interpretation by making it clear in their reply brief that they are asserting a "separate, independent, stand-alone cause-of-action imposing [a] duty owing to individual citizens for [a local public entity] to maintain its property." Plaintiffs further claim that "[c]odified duty is still enforceable, individual duty separate from common law." Thus, plaintiffs have expressly stated that they believe that there are two separate, independent, duties: a common-law duty and a statutory duty. This is simply not the case. Even *Wagner v. City of Chicago*, 166 Ill. 2d 144, 150 (1995), a case relied on by plaintiffs, makes this clear: " 'Th[e] limitation on the scope of the duty in section 3-102(a) is in keeping with the scope of that duty as it existed at common law. The Tort Immunity Act creates no new duties but merely codifies those existing at common law. [Citations.] At common law, a municipality had a duty to maintain its property in a safe condition ***.' " (quoting *West v. Kirkham*, 147 Ill. 2d 1, 14 (1992)). The statutory duty *is* the common-law duty, simply published in statutory form. Plaintiffs' insistence otherwise requires us to affirm the trial court's dismissal of these counts.

¶ 61                                    2. Section 3-103

¶ 62        Similarly, counts XXXVII (against the District), LVIII (against Park Ridge), and LXXV (against Maine Township) were for "duty to remedy [a] dangerous plan" and allege that section 3-103 of the Tort Immunity Act set forth a duty for a local public entity to correct known unsafe conditions related to the design and/or engineering of an approved plan, which defendants did not do. Section 3-103(a) provides:

> "A local public entity is not liable under this Article for an injury caused by the adoption of a plan or design of a construction of, or an improvement to public property where the plan or design has been approved in advance of the construction or improvement by the legislative body of such entity or by some other body or employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved. The local public entity is liable, however, if after the execution of such plan or design it appears from its use that it has created a condition that it is not reasonably safe." 745 ILCS 10/3-103(a) (West 2012).

¶ 63        Again, as with section 3-102(a), section 3-103(a) "codifies [the] common-law duty of care in the making of public improvements." *Salvi*, 2016 IL App (2d) 150249, ¶ 43; see also *O'Brien v. City of Chicago*, 285 Ill. App. 3d 864, 871 (1996) ("Sections 3-102(a) and 3-103(a) codify [common law] duties but do not impose any new obligations on local governments."); *Horrell v. City of Chicago*, 145 Ill. App. 3d 428, 435 (1986) ("[T]he 'duties' *** that are found in section 3-103(a) regarding the execution of a plan[ ] are derived from the basic common law duty articulated in section 3-102."). At common law, a municipality had a duty to maintain its property in a safe condition, but this duty did not extend to creating

or erecting public improvements. *West v. Kirkham*, 147 Ill. 2d 1, 14 (1992). Once a public improvement was actually constructed, however, the municipality has a duty to maintain it in a reasonably safe condition. *West*, 147 Ill. 2d at 14.

¶ 64    In the case at bar, again, while the substance of these counts could be interpreted as alleging negligence based on a breach of defendants' common-law duty in the making of public improvements, plaintiffs have foreclosed this interpretation in their reply brief by making clear that they are alleging that section 3-103(a) "declare[s] [a] separate and independent dut[y]" and that this "statutory dut[y] [is a] separate and independent, individual dut[y] from the common law." Accordingly, we must affirm the trial court's dismissal of these counts.

¶ 65                    B. Common Law Counts

¶ 66    Next, plaintiffs alleged several counts based on common law negligence.

¶ 67                1. Dominant Estate Overburdening

¶ 68    Counts XXV (against the District), XLV (against Park Ridge), and LXIV (against Maine Township) were for "negligence: dominant estate overburdening stormwater" and alleged that defendants knew or should have known of the foreseeable harm of invasive flooding into plaintiffs' neighborhood given the history of flooding and that defendants owed nondelegable duties to properly manage the storm water so as to prevent harm to plaintiffs from excess storm water overburdening the drainage system. On appeal, plaintiffs "abandon their Dominant Estate Overburdening claim" but argue that the facts alleged in these counts give rise to an "adjacent property owner" claim.

¶ 69    Generally, a landowner owes no duty to adjoining landowners for dangerous natural conditions present on the land, but may owe a duty if the condition is artificial or where a

37

natural condition is aggravated by the owner's use of the area. See *Dealers Service & Supply Co. v. St. Louis National Stockyards Co.*, 155 Ill. App. 3d 1075, 1079 (1987); *Choi v. Commonwealth Edison Co.*, 217 Ill. App. 3d 952, 957 (1991). Additionally, a local public entity bears a common law duty not to increase the natural flow of surface water onto the property of an adjacent landowner. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 369 (2003). Defendants claim that, because they were not "adjacent landowners," these counts should be dismissed. We agree.

¶ 70    In the case at bar, plaintiffs have not alleged that defendants are landowners, much less landowners adjacent to plaintiffs' property. Plaintiffs have alleged that defendants own the sewers and the drains, but have not alleged that defendants own the real property under which those sewers and drains run. Instead, they allege that defendants were the holders of easements for the purpose of drainage and sewers, which ran through plaintiffs' neighborhood, and that it was these systems that overflowed and damaged plaintiffs' property. The only adjacent landowner plaintiffs identify in their complaint is Advocate.

¶ 71    Given the status of defendants as easement holders, not landowners, the appropriate cause of action would be for the overburdening of their easement. However, plaintiffs have expressly abandoned that claim on appeal. In the absence of that legal framework, we find no basis for applying "adjacent property owner" liability to defendants; plaintiffs have cited no authority applying such a duty without first establishing that the defendant was actually a landowner. Accordingly, we must affirm the dismissal of these counts.

¶ 72                                    2. Negligent Nuisance

¶ 73    Counts XXXI (against the District), LII (against Park Ridge), and LXIX (against Maine Township) were for "negligent nuisance" and alleged that defendants negligently caused an

accumulation of water from the drainage system to invade and interfere with plaintiffs'
property. "A private nuisance is a substantial invasion of another's interest in the use and
enjoyment of his or her land. The invasion must be: substantial, either intentional or
negligent, and unreasonable." *In re Chicago Flood Litigation*, 176 Ill. 2d at 204. The
standard for determining if particular conduct constitutes a nuisance is its effect on a
reasonable person. *In re Chicago Flood Litigation*, 176 Ill. 2d at 204. Our supreme court has
explained the difference between the type of invasion that nuisance protects as compared to
the type of invasion that trespass protects:

> " 'A trespass is an invasion of the interest in the exclusive possession of land, as by
> entry upon it. *** A nuisance is an interference with the interest in the private use and
> enjoyment of the land, and does not require interference with the possession.' " *In re
> Chicago Flood Litigation*, 176 Ill. 2d at 204 (quoting Restatement (Second) of Torts
> § 821D cmt. d, at 101 (1979)).

¶ 74    In the case at bar, the complaint alleges that defendants negligently permitted an
accumulation of storm water runoff in their drainage and sewage systems due to their
management of the systems, which caused flood water to invade and interfere with plaintiffs'
property on September 13, 2008. The complaint further alleges that such interference was
substantial and unreasonable. These allegations are sufficient to state a cause of action for
negligent nuisance so as to withstand dismissal pursuant to section 2-615.

¶ 75                                    3. Negligent Trespass

¶ 76    Counts XXXII (against the District), LIII (against Park Ridge), and LXX (against Maine
Township) were for "negligent trespass" and alleged that, due to defendants' failure to
properly manage the storm water systems, water invaded plaintiffs' property. A trespass is an

39

invasion in the exclusive possession and physical condition of real property. *Millers Mutual Insurance Ass'n of Illinois v. Graham Oil Co.*, 282 Ill. App. 3d 129, 139 (1996). "[O]ne can be liable under present-day trespass for causing a thing or a third person to enter the land of another either through a negligent act or an intentional act." *Dial v. City of O'Fallon*, 81 Ill. 2d 548, 556-57 (1980).

¶ 77    In our prior decision concerning Advocate, we found that the complaint adequately alleged that Advocate could be liable for intentional trespass based on its conduct with respect to its drainage system. See *Tzakis*, 2015 IL App (1st) 142285-U, ¶ 74. We found:

> "Taken as a whole, [plaintiffs'] allegations are far from mere conclusory allegations. Plaintiffs identify numerous examples that suggest [Advocate] was aware of the flooding problem, and knowingly took inadequate measures to correct it. Plaintiffs' allegations identify specific components of [Advocate's] drainage system as deficient, and demonstrate multiple instances where [Advocate] had occasion to address the problems and failed to do so adequately. As with the examples of piling sand adjacent to another's property, or erecting a dam to alter the flow of a stream, plaintiffs' allegations regarding [Advocate's] conduct are sufficient to show that [Advocate] acted with a high degree of certainty that its modifications to the drainage system would cause or fail to prevent flooding to plaintiffs' homes." *Tzakis*, 2015 IL App (1st) 142285-U, ¶ 74.

¶ 78    In the case at bar, plaintiffs are not alleging intentional trespass as they did against Advocate.[14] Thus, they are not required to allege the high degree of certainty required by an intentional trespass claim. However, the allegations against Advocate, which we found

---

[14]We note that plaintiffs did, in fact, originally include counts for intentional trespass, but those counts were voluntarily dismissed and are not at issue on appeal.

satisfied such a high bar, also apply in large part to defendants, as they are alleged to have approved all of Advocate's plans. Thus, our prior decision is certainly instructive to the analysis in the instant appeal. In the case at bar, plaintiffs have alleged that there was an invasion in their properties due to the excess storm water runoff. Plaintiffs have further alleged that this invasion was caused by defendants' negligent design and operation of their drainage and sewer systems. These allegations adequately set forth causes of action for negligent trespass against defendants so as to withstand a section 2-615 motion to dismiss.[15]

¶ 79                                  C. Takings Clause

¶ 80        Finally, plaintiffs claimed that the flooding of their property was an unconstitutional taking that violated the Illinois Constitution. The takings clause of the Illinois Constitution provides that "[p]rivate property shall not be taken or damaged for public use without just compensation as provided by law. Such compensation shall be determined by a jury as provided by law." Ill. Const. 1970, art. I, § 15. Our supreme court has defined a "taking" as "a physical invasion of private property or the radical interference with a private property owner's use and enjoyment of the property." *Hampton v. Metropolitan Water Reclamation District*, 2016 IL 119861, ¶ 24. The supreme court has further indicated that "a taking occurs when real estate is physically invaded 'by superinduced additions of water *** so as to effectually destroy or impair its usefulness.' " *Hampton*, 2016 IL 119861, ¶ 24 (quoting *Horn v. City of Chicago*, 403 Ill. 549, 554 (1949)). Our supreme court has recently made explicit that a temporary flooding may constitute a taking. *Hampton*, 2016 IL 119861, ¶ 22; see also

---

[15]At the end of their brief, plaintiffs include a brief paragraph concerning "equitable relief." It is not apparent what argument they are attempting to make, and plaintiffs do not tie this request into any particular cause of action. As it has not been properly developed, we do not consider this argument. See *Lebron*, 237 Ill. 2d at 253; Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("Points not argued [in the appellant's brief] are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").

*Pineschi v. Rock River Water Reclamation District*, 346 Ill. App. 3d 719, 727 (2004) (temporary flooding caused by backup of sewer system may constitute a taking).

¶ 81  Our supreme court has also found instructive additional factors set forth by the United States Supreme Court in determining whether a temporary flooding constitutes a taking; "[t]hese factors include the time and duration of the flooding, whether the invasion of the property was intentional or whether it was a foreseeable result of an authorized government action, and the character of the land and the owner's reasonable investment-backed expectations regarding the land's use." *Hampton*, 2016 IL 119861, ¶ 25 (citing *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 38-39 (2012)).

¶ 82  In the case at bar, defendants claim that plaintiffs' takings clause claims must fail because the water overflow was the result of Advocate's conduct, not theirs. "To constitute a government taking or compensable government action, the water overflow must be the result of a structure or action imposed by the governmental entity ***." *Sorrells v. City of Macomb*, 2015 IL App (3d) 140763, ¶ 33. In *Sorrells*, the plaintiff homeowners filed suit against a developer who was developing adjacent property in a way that the plaintiffs alleged altered the natural drainage of surface waters and caused an increase of water drainage onto their property. *Sorrells*, 2015 IL App (3d) 140763, ¶ 4. The plaintiffs also included an inverse condemnation claim against the defendant city, which the plaintiffs alleged had approved the construction and design of the developer's plans, and to whom the streets and drainage system had been dedicated. *Sorrells*, 2015 IL App (3d) 140763, ¶¶ 17-18. The plaintiffs alleged that the city's actions constituted a taking under the takings clause of the Illinois Constitution. *Sorrells*, 2015 IL App (3d) 140763, ¶ 18.

¶ 83        On appeal, the *Sorrells* court affirmed the trial court's dismissal of the counts aimed at the city. The court first noted that the plaintiffs alleged that the private development as a whole caused the allegedly unreasonable surface water drainage, not the streets that belonged to the city. *Sorrells*, 2015 IL App (3d) 140763, ¶ 30. The court found that the complaint "makes clear that the water allegedly invading the plaintiffs' property was drainage from two [private] storm water detention basins or other drainage basins." *Sorrells*, 2015 IL App (3d) 140763, ¶ 31. The court further found that the plaintiffs failed to allege that this unreasonable water draining from the development onto their land "was the intended or foreseeable result, in whole or in part, of the City's actions rather than that of the development." *Sorrells*, 2015 IL App (3d) 140763, ¶ 32.

¶ 84        The *Sorrells* court also noted that condemnation cases "traditionally arise from government action alone; not from multiple causes that would include actions of private actors, as in this case where the water was from the whole development flowing into detention basins." *Sorrells*, 2015 IL App (3d) 140763, ¶ 33. In the case before it, the court found that "the alleged flooding of the plaintiffs' land was from the overflow of drainage and detention basins, not from the City's actions." *Sorrells*, 2015 IL App (3d) 140763, ¶ 33. Consequently, the court affirmed the dismissal of the inverse condemnation claim.

¶ 85        In the case at bar, contrary to defendants' claim, we cannot agree that the situation is analogous to that present in *Sorrells*. The instant case is not one in which Advocate developed its property, then later dedicated the streets and drainage system to defendants. Instead, plaintiffs allege much more hands-on involvement and ongoing responsibility from defendants. Additionally, plaintiffs allege a history of flooding prior to the 2008 flooding at issue, indicating that defendants knew of the increased risk of flooding. Finally, plaintiffs

point to numerous areas in which defendants were allegedly negligent, including through the use of undersized drains. We note that we are not asked to determine whether plaintiffs will be successful in ultimately proving their takings claim—at this stage of the proceedings, a cause of action will not be dismissed on the pleadings unless it clearly appears that the plaintiff cannot prove any set of facts that will entitle it to relief. *Board of Directors of Bloomfield Club Recreation Ass'n*, 186 Ill. 2d at 424. Under the facts as alleged by plaintiffs, their claims under the takings clause are sufficient to satisfy this hurdle.

¶ 86                          D. Section 2-619 Motions to Dismiss

¶ 87        As explained above, we have determined that the counts concerning negligent nuisance, negligent trespass, and the takings clause (1) should not have been barred by the public duty rule and (2) are sufficient to withstand dismissal under section 2-615 of the Code. However, these counts were also subject to motions to dismiss pursuant to section 2-619 of the Code. Thus, we must consider whether they should have been dismissed under that section in order to determine whether there remains an alternate basis for affirming the trial court's judgment.

¶ 88        On appeal, defendants claim that plaintiffs' causes of action against them should have been dismissed pursuant to several sections of the Tort Immunity Act. The Tort Immunity Act was enacted in 1965 in response to the supreme court's abolition of sovereign immunity. *Monson*, 2018 IL 122486, ¶ 15. It protects local public entities and their employees from liability arising from government operations. *Monson*, 2018 IL 122486, ¶ 15; 745 ILCS 10/1-101.1(a) (West 2006). The purpose of the Tort Immunity Act "is to prevent the dissipation of public funds on damage awards in tort cases." *Monson*, 2018 IL 122486, ¶ 15. "Since the [Tort Immunity] Act was enacted in derogation of the common law, it must be strictly construed." *Van Meter*, 207 Ill. 2d at 368; *Monson*, 2018 IL 122486, ¶ 15. "Unless an

immunity provision applies, municipalities are liable in tort to the same extent as private parties." *Van Meter*, 207 Ill. 2d at 368-69; *Monson*, 2018 IL 122486, ¶ 15. "Because the immunities afforded to governmental entities operate as an affirmative defense, those entities bear the burden of properly raising and proving their immunity under the [Tort Immunity] Act. It is only when the governmental entities have met this burden that a plaintiff's right to recovery is barred." *Van Meter*, 207 Ill. 2d at 370.

¶ 89                          1. Sections 2-109 and 2-201

¶ 90        Defendants first rely on sections 2-109 and 2-201 of the Tort Immunity Act. Section 2-109 provides:

> "A local public entity is not liable for any injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109 (West 2006).

Section 2-201 provides:

> "Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201 (West 2006).

Our supreme court has observed that "[s]ection 2-201 extends the most significant protection afforded to public employees under the [Tort Immunity] Act." *Van Meter*, 207 Ill. 2d at 370. Read together, sections 2-109 and 2-201 immunize a public entity from liability for the discretionary acts or omissions of its employees. *Monson*, 2018 IL 122486, ¶ 16.

¶ 91        In order for immunity to attach, a court must conduct a dual-prong inquiry. See *Van Meter*, 207 Ill. 2d at 373. First, a defendant claiming immunity under section 2-201 must establish that its employee held either a position involving the determination of policy or a

45

position involving the exercise of discretion. *Monson*, 2018 IL 122486, ¶ 29. Additionally, "immunity will not attach unless the plaintiff's injury results from an act performed or omitted by the employee in determining policy *and* in exercising discretion." (Emphasis in original.) *Harinek*, 181 Ill. 2d at 341 (1998). Thus, while under the statute, the employee's position may be one which involves either determining policy or exercising discretion, in order for immunity to apply, the act or omission itself must be both a determination of policy and an exercise of discretion. *Harinek*, 181 Ill. 2d at 341.

¶ 92      Our supreme court has defined " 'policy decisions made by a municipality' " as " 'those decisions which require the municipality to balance competing interests and to make a judgment call as to what solution will best serve each of those interests.' " *Harinek*, 181 Ill. 2d at 342 (quoting *West*, 147 Ill. 2d at 11). With respect to discretionary decisions, "the distinction between discretionary and ministerial functions resists precise formulation, and *** the determination whether acts are discretionary or ministerial must be made on a case-by-case basis." *Snyder v. Curran Township*, 167 Ill. 2d 466, 474 (1995). Our supreme court has defined the terms as follows:

> "[D]iscretionary acts are those which are unique to a particular public office, while ministerial acts are those which a person performs on a given state of facts in a prescribed manner, in obedience to the mandate of legal authority, and without reference to the official's discretion as to the propriety of the act." *Snyder*, 167 Ill. 2d at 474.

Additionally, discretionary decisions " 'involve the exercise of personal deliberation and judgment in deciding whether to perform a particular act, or how and in what manner that act

should be performed.' " *Monson*, 2018 IL 122486, ¶ 30 (quoting *Wrobel v. City of Chicago*, 318 Ill. App. 3d 390, 395 (2000)).

¶ 93       In the case at bar, plaintiffs have alleged a number of actions and omissions that they claim subject defendants to liability. While defendants are undoubtedly correct that at least some of these actions would fall under the purview of section 2-201 immunity, we cannot agree with their position that they are wholly immune from liability such that dismissal is warranted.

¶ 94       For instance, one of the allegations against defendants is that the drainage and sewer systems represented a dangerous condition and that defendants failed to correct that condition by, *inter alia*, not pumping down the retention basins prior to the September 2008 storm. Our supreme court has recognized that decisions involving repairs to public property can be a discretionary matter subject to immunity under section 2-201. *Monson*, 2018 IL 122486, ¶ 33. However, "a public entity claiming immunity for an alleged failure to repair a defective condition must present sufficient evidence that it made a conscious decision not to perform the repair. The failure to do so is fatal to the claim." *Monson*, 2018 IL 122486, ¶ 33. Here, there has been no showing that it was a conscious decision not to pump down the basins prior to the storm. Accordingly, that decision would not be subject to section 2-201 immunity.

¶ 95       As noted, "[s]ection 2-201 extends the most significant protection afforded to public employees under the [Tort Immunity] Act." *Van Meter*, 207 Ill. 2d at 370. Thus, we must be especially careful when speaking broadly about sweeping all of defendants' alleged conduct with the same brush. In the case at bar, plaintiffs have alleged acts and omissions by defendants that would not be subject to section 2-201 immunity. Accordingly, it is inappropriate to wholly dismiss the counts aimed at defendants on the basis of that immunity

47

and we cannot find that section 2-201 immunity serves as an alternate basis for dismissal of plaintiffs' complaint at this time.

¶ 96                                  2. Section 2-105

¶ 97         Defendants next claim that they are immune under section 2-105 of the Tort Immunity Act, which provides:

> "A local public entity is not liable for injury caused by its failure to make an inspection, or by reason of making an inadequate or negligent inspection, of any property, other than its own, to determine whether the property complies with or violates any enactment or contains or constitutes a hazard to health or safety." 745 ILCS 10/2-105 (West 2006).

¶ 98         In the case at bar, plaintiffs allege that all three defendants own and operate various portions of the drainage and sewer systems at issue. We agree with defendants that, under section 2-105, each defendant is immune from liability for a failure to inspect any property that is not determined to belong to that defendant. However, at this point in the litigation, we must take the allegations of the complaint as true (*Morr-Fitz, Inc.*, 231 Ill. 2d at 488), and therefore must accept plaintiffs' allegations that defendants own the property at issue. Accordingly, section 2-105 does not provide an alternate basis for dismissal of the complaint.

¶ 99                                  3. Section 2-104

¶ 100        Next, defendants Park Ridge and the District claim that they are immune under section 2-104 of the Tort Immunity Act.[16] Section 2-104 provides:

---

[16]While the three defendants filed a joint brief on appeal and do not specify which defendants are making this argument, the motion to dismiss filed by Maine Township before the trial court does not list section 2-104 as a basis for dismissal. Accordingly, we consider this section with respect to Park Ridge and the District alone.

48

"A local public entity is not liable for an injury caused by the issuance, denial, suspension or revocation of, or by the failure or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval, order or similar authorization where the entity or its employee is authorized by enactment to determine whether or not such authorization should be issued, denied, suspended or revoked." 745 ILCS 10/2-104 (West 2006).

¶ 101     In the case at bar, plaintiffs allege that these defendants should be held liable for plaintiffs' flooding damage in part because they approved Advocate's plans for its drainage system. We agree with defendants that, to the extent that plaintiffs claim that their injury was caused by defendants' approval of Advocate's plans, the plain language of section 2-104 immunizes defendants from liability for such claims. However, such immunity is limited to injuries caused by the approval itself—where defendants' actual actions or omissions are at issue, section 2-104 immunity would not apply. See *Salvi*, 2016 IL App (2d) 150249, ¶ 46 (denying section 2-104 immunity where the village's actions in reconstructing a pond and developing a parcel were at issue, as opposed to its issuance of permits or approvals). Therefore, dismissal at this time is not warranted.

¶ 102                                         4. Section 3-110

¶ 103     Finally, defendants Maine Township and Park Ridge claim that they are immune from liability under section 3-110 of the Tort Immunity Act.[17] Section 3-110 provides:

"Neither a local public entity nor a public employee is liable for any injury occurring on, in, or adjacent to any waterway, lake, pond, river or stream not owned,

---

[17]The District's motion to dismiss did not raise section 3-110 as a basis for dismissal, and accordingly, we consider the section with respect to Maine Township and Park Ridge alone.

supervised, maintained, operated, managed or controlled by the local public entity."

745 ILCS 10/3-110 (West 2006).

¶ 104    In the case at bar, these defendants argue that all injury resulted from flooding that came from a waterway—the Prairie Creek Stormwater System—and that plaintiffs did not allege facts supporting their claim that Maine Township or Park Ridge owned, supervised, maintained, operated, managed, or controlled any component of that system. We do not find this argument persuasive. First, the Prairie Creek Stormwater System as a whole would not be considered a "waterway" for purposes of section 3-110. As defined in the complaint, the Prairie Creek Stormwater System is a system of public improvements consisting of (1) open drains, (2) enclosed pipes, (3) retention basins, and (4) tributary storm water sewers that run under the streets. While the retention basins would arguably fall under section 3-110's definition of a "pond," the remainder of the system would certainly not be considered a "waterway." See Black's Law Dictionary 1623 (8th ed. 1999) (defining "waterway" in the same way as "watercourse": "A body of water, [usually] of natural origin, flowing in a reasonably definite channel with bed and banks. The term includes not just rivers and creeks, but also springs, lakes, and marshes in which such flowing streams originate or through which they flow."); American Heritage Dictionary 1367 (2d College ed. 1985) (defining "waterway" as "[a] navigable body of water, such as a river, channel, or canal"); Oxford Living Dictionaries, https://en.oxforddictionaries.com/definition/waterway (last visited May 10, 2019) [https://perma.cc/NU2H-LWKW] (defining "waterway" as "[a] river, canal, or other route for travel by water"). Thus, section 3-110 immunity would not apply.

¶ 105    Furthermore, plaintiffs' complaint alleges that both defendants bore responsibility for the portions of the system falling within their jurisdictions. While defendants point to a comment

by plaintiffs' counsel that they claim constitutes an admission that Maine Township did not "own" the system, even if that comment is read in the way defendants wish, section 3-110 limits immunity not only for owners but also for those who "supervise[ ], maintain[ ], operate[ ], manage[ ] or control[ ]" such waterways. 745 ILCS 10/3-110 (West 2006). As noted, the complaint alleges that defendants bore such responsibility over the system. In the case at bar, then, section 3-110 does not serve as an alternate basis for dismissal of plaintiffs' complaint.

¶ 106                                 CONCLUSION

¶ 107       For the reasons set forth above, the trial court erred in applying *Coleman* prospectively and, accordingly, erroneously granted defendants' section 2-615 motion to dismiss on the basis of the public duty rule. However, the counts based on violations of the Tort Immunity Act and for adjacent property owner liability were nevertheless properly dismissed under section 2-615 because plaintiffs failed to state causes of action with respect to each of those counts. The counts based on negligent nuisance, negligent trespass, and the takings clause were sufficient to withstand dismissal under section 2-615, and most of defendants' claims of immunity under the Tort Immunity Act do not provide an alternate basis for dismissal of those counts under section 2-619. Accordingly, we reverse the trial court's dismissal of plaintiffs' complaint with respect to defendants Park Ridge, Maine Township, and the District on those counts.

¶ 108       Affirmed in part and reversed in part.